IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 12, 2014

**ROBERT D. MENDENHALL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2006-A-231, 2006-C-2134      Cheryl Blackburn, Judge**

---

**No. M2012-01890-CCA-R3-PC - Filed April 2, 2014**

---

Petitioner, Robert D. Mendenhall, was indicted in case number 2006-A-231 for two counts of solicitation to commit first degree murder and in case number 2006-C-2134 for two counts of theft of property valued at over $60,000, and four counts of violations of the Tennessee Securities Laws. Subsequently, Petitioner pled guilty to two counts of solicitation to commit first degree murder in case number 2006-A-231. He also pled guilty to two counts of theft of property over $60,000, one count of securities fraud by a device, scheme, or artifice, and securities fraud by sale of an unregistered security in case number 2006-C-2134. As a result of the guilty pleas, Petitioner received an effective sentence of forty years. He was represented by separate counsel in each case. Petitioner filed a timely pro se petition for post-conviction relief in which he alleged that he received ineffective assistance of counsel, among other things. After a hearing on the petition, the post-conviction court denied relief. On appeal, Petitioner challenges the denial of post-conviction relief. Upon review, we determine that Petitioner has failed to show clear and convincing evidence that he received ineffective assistance of counsel or that his guilty plea was unknowing and involuntary. Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JEFFREY S. BIVINS, JJ., joined.

Paula Ogle Blair, Nashville, Tennessee, for the appellant, Robert D. Mendenhall.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Victor S. Johnson, III, District Attorney General, and Jim Milam, Assistant District Attorney General, for the appellant, State of Tennessee.

## OPINION

### *Factual Background*

Petitioner was indicted by the Davidson County Grand Jury in January of 2006 in case number 2006-A-231 for two counts of solicitation to commit first degree murder. In July of 2006, Petitioner was indicted by the Davidson County Grand Jury for two counts of theft of property; one count of making false statements in connection with the offer, sale, or purchase of securities; one count of omitting material facts in connection with the offer, sale, or purchase of securities; one count of willfully employing a device, scheme, or artifice in connection with the offer, sale, or purchase of securities; and one count of willfully selling an unregistered security.

At the guilty plea hearing, counsel for the State testified that, had the case gone to trial, the State's proof would have shown that:

[Petitioner] was actually using the name of . . . , when he met the victim, Vickie Jacobs, in that case [2006-C-2134]. He was doing this consciously and deliberately, having obtained a Tennessee driver's license in that name on December 11th, 2001, and having given a false date of birth and a false social security number when he obtained that Tennessee driver's license.

Subsequent to that [Petitioner] began to engage in business here in the State of Tennessee. He met Ms. Jacobs sometime in the fall of 2002. At the time that he met Ms. Jacobs she had recently suffered two personal tragedies in the form of the death of her husband from cancer and the death of her daughter who was killed in an accident with a[n] intoxicated driver. As a result of those tragedies, Ms. Jacobs was in - - had been in a great state of grief and she was looking for help to manage her finances because she did have assets from her and her husband's property and also from a life insurance policy that had paid off on her husband, a $100,000 death benefit.

The proof would show that Mr. Bill Bryson (phonetic) was her insurance agent and that per his advice she decided to let that $100,000 go into a money market account with Equitable Insurance Company. On January 23rd, 2003, [Petitioner], posing as . . . , persuaded Ms. Jacobs to invest $100,000 in a company that he was promoting to her. He described this company as one that was going to produce Amber Alert technology, which

would be a huge seller when it hit the market and made promises to her such as this would be the next Microsoft, she was one of a small number of investors who [were] being allowed to buy share of this stock before public offering, that once the stock went public on one of the stock exchanges the price would jump and she would make a lot of money. He also - - well on January 23rd she paid him two checks, one check for the amount of $50,000 out of the Equitable money market account I just described. And the second check was $50,000 out of her Bank of America Investment account.

He took this money, having instructed her to make it out to Horse Creek Insurance Group, which was an Illinois Company that he was the sole owner of. And he took this money and deposited it into two different bank accounts, which he operated as the sole account holder for Horse Creek Insurance Group, and then began to spend the money for his own needs and desires.

Ms. Jacobs continued to believe that this was a promising investment. And in April of 2003, having been groomed some more by [Petitioner] that she needed to put more of her money into this investment, she invested an additional $200,000. This was in the form of three checks from her Bank of America securities account, one in the amount of $100,000, and one in the amount of $50,000, and the third one in the amount of $50,000. At this point Ms. Jacobs was investing not only her own money but the money from the college funds that had been accumulated for her two surviving daughters. [Petitioner] took this money and as he had done before he put it into the Horse Creek Insurance Group account and began to dissipate it for his own personal needs and desires.

The proof would show that of this $300,000 that Vickie Jacobs paid to [Petitioner] for an investment, he spent approximately three quarters of it for personal or family expenses in the form of cash, credit card payments, rent, school tuition, jewelry, and other various and sundry purchases. Approximately twenty percent of the money was transferred into existing business accounts with the Event Horizons Technology Software or later Rapid Technologies - - or actually it was paid to vendors on behalf of one of those two companies.

Now, Ms. Jacobs was not provided with any stock certificates by [Petitioner] until June of 2003, which was five months after her initial investment. At that time she received 300,000 shares of - - certificates for 300,000 shares of a company called Rapid Technologies Group Inc., a

-3-

company that was not formed until May 22nd of 2003 under the laws of the State of Delaware. That company went defunct in November of 2004. Ms. Jacobs has never received any return on her investment or any return of any of the principle investment despite repeated requests to [Petitioner] and efforts to locate it and efforts to secure the return of her money.

Now, in 2003 after the full $300,000 had been invested, Ms. Jacobs attempted to get [Petitioner] to return, first, a portion of her investment and later all of it. And this was because he had promised her she could get her money out any time she wanted to and made other promises to her such that within a year she would have a million dollars from her investment. But he always stalled her and had various excuses as to why he could not return any of the money.

Finally, Ms. Jacobs discovered [Petitioner's] phone number was disconnected. She became unable to locate him. She became alarmed at the prospect that she may never get her money back and that this was the money she needed to live on since her husband had died. And she was basically a stay-at-home mother. So she began to contact, first, the SEC and later the Tennessee Securities Division, which led to the investigation.

As stated before, [Petitioner] used several devices in achieving this fraud on Ms. Jacobs. The first was a false date of birth, false name, and false social security number and also that he had her make the checks out to Horse Creek Insurance Group. And at the time the defendant was not licensed to sell insurance in Tennessee and was not able to sell insurance in Tennessee. But he was living in Tennessee. He also told the defendant that he owned his home in Murfreesboro, which was in a nice neighborhood. Ms. Jacobs found out after she became unable to locate [Petitioner] that he never owned that home. He had, in fact, been renting it, and he had moved out and disappeared and she didn't know where he was. So with the help of securities investigators this investigation was commenced ultimately resulting in [Petitioner's] arrest.

Also in this case the security, which [Petitioner] offered and sold Ms. Jacobs, was not registered, even though under the laws of Tennessee the State's witnesses would testify that it was required to be registered because it did not fit within any of the recognized legal exemptions for sale of a security. So [Petitioner] violated that law as well.

-4-

All these events occurred here in Davidson County with Ms. Jacobs being a resident of this city and county.

In case 2006-A-231 the State's proof would show that [Petitioner] was arrested in August of 2005, first, on an indictment out of Rutherford County, Tennessee for securities fraud in Rutherford County.

He initially made bond on that case but was subsequently rearrested. And at that time the Rutherford County District Attorney was being assisted by two attorneys from the Tennessee Securities Division, Ms Barbara Doak and Ms. Mary Griffin. Ms. Doak and Ms. Griffin worked with the Rutherford County D.A. in prosecuting the Rutherford County case. And later they worked with me as a representative of the Davidson County District Attorney's office in prosecuting the defendant on the Davidson County securities case. And, of course, they're here today.

Now, in November of 2005 [Petitioner] was incarcerated not only on the Rutherford County indictment, but he had also been served with papers for the Davidson County securities indictment. He became convinced that Ms. Doak and Ms. Grifffin presented an obstacle of his being able to be released on bail and to "beat these charges." And so [Petitioner] decided that - - he began talking in the jail to others about needing to kill Ms. Doak and Ms. Griffin and wanting to have them killed. The sheriff's department received word that these threats were being made by [Petitioner] against these two attorneys, and an investigation was commenced in November of 2005. That began with an investigator from our office, Joe Jones, interviewing the inmate at the Davidson County jail who gave a detailed account of the discussions that [Petitioner] was having with others about trying to locate someone who would be getting out soon who could kill these two attorneys.

Subsequently the District Attorney's office referred this matter to the Tennessee Bureau of Investigation. And with the help of an undercover TBI agent an introduction was made between the undercover agent and [Petitioner] over the telephone. [Petitioner] in three recorded telephone calls discussed with the undercover agent, who went by the name of Bobby, the arrangements for Bobby to, first of all, identify, locate, and then to actually to arrange the murder of Ms. Griffin and Ms. Doak.

And on January 6, 2006, in a telephone call [Petitioner] discussed with Bobby a price for the job. He discussed the manner that it would be committed

and the timing for his need for it to be committed. He also informed Bobby that these attorneys would be in court in Rutherford County on Monday, January the 9th, I believe. . . . [Petitioner] had also passed a handwritten note with these attorneys' names and addresses on it - - had passed that note to an inmate who gave it to Bobby. And that note, it would be testified by a handwriting expert, was in [Petitioner's] handwriting.

The undercover agent with Rutherford County did, indeed, observe the two attorneys who [Petitioner] had described to him so that the next time he spoke to [Petitioner] on the phone he was able to tell [Petitioner] that, yes, he had seen them there. The phone call on January 13th, 2006 - - in that phone call [Petitioner] reiterated that he, indeed, wanted this job to be carried out and that he was willing to pay the agent, who he believed to be a hitman, to do it.

After that, the State confronted or sent the investigator and the undercover agent to the jail to confront [Petitioner] at which time [Petitioner] learned the true identity of Bobby and that he was not a hitman but was, in fact, an agent of the TBI.

These events occurred also here in Davidson County, Tennessee.

On January 22, 2007, Petitioner pled guilty to two counts of solicitation to commit first degree murder in case number 2006-A-231. In exchange for the guilty plea, Petitioner received a twenty-year sentence for each conviction, to be served consecutively to each other but concurrently to the sentence in case number 2006-C-2134. Petitioner was classified as a Range III, multiple offender. In case number 2006-C-2134, Petitioner pled guilty to two counts of theft of property over $60,000, one count of securities fraud by using an artifice, scheme, or device to defraud investors, and one count of securities fraud by selling an unregistered security. The remaining counts were dismissed. In case number 2006-C-2134, Petitioner received a twenty-year sentence for each theft conviction and a five-year sentence for each securities fraud conviction. Petitioner was ordered to pay a total of $300,000 in restitution. The theft sentences were ordered to be served concurrently to each other and to the five-year sentence for securities fraud by using an artifice, scheme, or device to defraud investors. The five-year sentence selling an unregistered security was ordered to be served consecutively to the remaining sentences, for a total effective sentence in case number 2006-C-2134 of twenty-five years.

On January 10, 2008, Petitioner filed a pro se petition for post-conviction relief in which he alleged that: (1) his conviction was based on an unknowing and involuntary guilty plea; (2) his conviction was based on the unconstitutional failure of the prosecution to disclose to defendant evidence favorable to defendant; (3) his conviction was based on a violation of double jeopardy; (4) he received ineffective assistance of counsel[1]; (5) the selection of the grand jury was unconstitutional; (6) there was false evidence presented to the grand jury; (7) the indictments were insufficient; (8) the prosecution committed misconduct; (9) there was judicial misconduct during the pendency of the case; and (10) cumulative error requires the grant of post-conviction relief.

Counsel was appointed, and an amended petition was filed. The post-conviction court held a hearing on the petition. At the hearing, Trial Counsel One testified that he was appointed to represent Petitioner in case number 2006-C-2134. In preparation for trial, Trial Counsel One met with Petitioner more than a dozen times. He spent, in his words, "a lot" of time with Petitioner.

Trial Counsel One described Petitioner's story as "very sympathetic." Trial Counsel One opined that Petitioner was "a horribly unsophisticated person who got mixed up in . . . high level financial transactions . . . he was . . . just a really good guy doing his best, and I don't think he had any, any evil intention." Trial Counsel One noted that Petitioner did not claim to be innocent but merely had the goal of getting probation.

Trial Counsel One was able to recall the names of a few potential witnesses who Petitioner mentioned. These witnesses were considered, but they were either not helpful to the defense or Trial Counsel One was unable to locate the witnesses. One witness in particular was in federal prison.

Trial Counsel One testified that he was "certain" he informed Petitioner that there would be a 404(b) hearing.[2] In fact, he recalled "significantly" preparing for the hearing because the first one was held in Rutherford County in a companion case, and the same preparation would have been beneficial in the Davidson County case.

---

[1] The petition alleged over 50 examples of ineffective assistance of counsel.

[2] This is a hearing conducted pursuant to Tennessee Rule of Evidence 404(b) where the trial court determines whether evidence of crimes other than those being tried would be admissible at the trial about to take place.

Trial Counsel One knew prior to trial that the State had a really solid case against Petitioner. He maintained that his only defense was to "hammer[ ] the table" claiming that no one ever proved that the stock Petitioner sold was actually worthless.

Trial Counsel One noted that leading up to the plea agreement, Petitioner had all but refused to consider pleading guilty and plea offers were "mostly non-existent."

Petitioner testified at the hearing that he openly questioned Trial Counsel One's trial practice and preparedness. Petitioner recalled feeling "disgusted" at the plea offer and rushed to enter the plea.

Trial Counsel Two was appointed to represent Petitioner in case number 2006-A-231. Trial Counsel Two assessed the State's case against Petitioner as good and "bad" for Petitioner. Specifically, Trial Counsel Two noted the recorded telephone calls in which Petitioner tried to hire a hit man to kill the two special prosecutors and the handwritten note in which Petitioner physically described the victims.

Trial Counsel Two did not have many discussions about a possible plea with Petitioner prior to the eve of trial. When the offer was made, Trial Counsel Two thought that the arrangement was good, considering Petitioner was facing upwards of fifty to sixty years in incarceration if he went to trial. Additionally, Trial Counsel Two was aware of Petitioner's status as a multiple offender. Trial Counsel Two described that it would be "very difficult" to get a defense verdict with the facts.

Petitioner, on the other hand, testified that he gave Trial Counsel Two the names of several witnesses and that Trial Counsel Two failed to follow up. Further, Petitioner claimed that Trial Counsel Two did not communicate with him effectively or consistently.

Petitioner admitted that Trial Counsel Two explained the purpose of the 404(b) hearing but claimed that there was information Trial Counsel Two did not have about Petitioner's dealings with 404(b) witnesses that would have been helpful. Petitioner did not provide any witnesses at the post-conviction hearing.

Petitioner claimed that he had a difficult time communicating with both trial counsel. In fact, Petitioner claimed that he called Trial Counsel Two from jail to request meetings and that Trial Counsel Two failed to show up for the meetings. Additionally, Petitioner claimed that Trial Counsel One met with him once prior to trial.

Petitioner testified that he felt rushed into pleading guilty and that the only advice he got from either counsel on the plea agreement was that it was a "good deal." Petitioner

claimed that Trial Counsel Two told him that he was not going to win all his trials so he had to choose between the plea agreement or a sentence of over 100 years. Petitioner stated that he felt "backed into a corner."

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In an order, the post-conviction court made extensive findings of fact and conclusions of law. As to Trial Counsel One, the post-conviction court determined that Petitioner did not show that Trial Counsel One was ineffective for either failing to withdraw or failing to recuse himself from the case because he was a former co-worker of one of the alleged victims in the solicitation case. The post-conviction court noted that Trial Counsel One obtained a consent form from Petitioner and that Petitioner failed to show that there was an actual conflict of interest or that he was prejudiced in any way.

The post-conviction court accredited the testimony of both Trial Counsel One and Trial Counsel Two with regard to the filing of a motion to recuse the trial judge. Neither counsel felt that the motion was warranted. The post-conviction court determined that Petitioner failed to prove this claim.

The post-conviction court determined that Petitioner did not receive ineffective assistance of counsel for failure of trial counsel to investigate the case or communicate with Petitioner. Specifically, the post-conviction court noted that only Trial Counsel One's case, 2006-C-2134, was scheduled to be tried on the day of the plea but that both Trial Counsel One and Trial Counsel Two testified that they were prepared for trial. The post-conviction court accredited their testimony. Further, the post-conviction court noted that both counsel attempted to thoroughly interview witnesses in preparation for trial and that Petitioner failed to present any of the witnesses he claims would have been beneficial at the post-conviction hearing. In other words, Petitioner failed to show clear and convincing evidence that he is entitled to post-conviction relief. Moreover, the post-conviction court determined that Petitioner failed to show that Trial Counsel One and Trial Counsel Two failed to communicate with him prior to the plea. In fact, the post-conviction court found that Petitioner provided "[n]othing" to indicate that either counsel "failed to meet with the petitioner or keep him informed."

The post-conviction court also determined that Petitioner failed to show that his guilty plea was unknowing or involuntary. Specifically, the post-conviction court accredited the testimony of trial counsel and found that the transcript of the guilty plea hearing reflects the opposite of Petitioner's claims. In other words, the post-conviction court determined that Petitioner failed to prove his claim by clear and convincing evidence.

Lastly, the post-conviction court addressed Petitioner's "other claims" of withheld evidence, denial of due process, denial of bond, and the denial of the right to introduce evidence. The post-conviction court deemed these issues waived as they were not addressed in the post-conviction hearing but, nonetheless, determined that Petitioner provided no evidence that the State withheld evidence. Further, the post-conviction court noted that the failure of the special prosecutors to withdraw from the case due to their status as victims is not cognizable in a post-conviction claim.

As a result, the post-conviction court denied relief and dismissed the petition. Petitioner filed an untimely notice of appeal. This Court waived the timely filing of the notice of appeal pursuant to Tennessee Rule of Appellate Procedure 4(a).

*Analysis*

On appeal, Petitioner argues that the post-conviction court improperly dismissed the petition. Specifically, he insists that Trial Counsel One and Trial Counsel Two were ineffective for failing to communicate with Petitioner, failing to interview witnesses, failing to investigate and properly prepare for the 404(b) hearing, and failing to prepare for trial. With respect to Trial Counsel Two, Petitioner also insists that trial counsel was ineffective for failing to file a motion to secure funds to hire an investigator. Petitioner also argues that his guilty plea was involuntarily and unknowingly entered because of both trial counsel's ineffectiveness. The State disagrees, arguing that the evidence does not preponderate against the findings of the post-conviction court.

*Post-conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not re-weigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

-10-

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing by clear and convincing evidence that "(a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial." *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996); *see also* T.C.A. § 40-30-110(f). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that the issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . .; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, Petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. *See Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citing *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). As stated above, in order to successfully challenge the effectiveness of counsel, Petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. Under *Strickland v. Washington*, Petitioner must establish: (1) deficient representation; and (2) prejudice resulting from the deficiency. 466 U.S. 668, 694 (1984). However, in the context of a guilty plea, to satisfy the second prong of *Strickland*, Petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty

and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

On appeal, Petitioner argues that Trial Counsel One was deficient because he failed to investigate witnesses in preparation for trial, failed to communicate with Petitioner, was unprepared for trial, and failed to prepare for the 404(b) hearing. Petitioner claims that had Trial Counsel One not been deficient he would not have pled guilty and would have insisted on going to trial. With regard to Trial Counsel Two, Petitioner claims that he did not communicate at critical stages of the case, did not interview witnesses or investigate the case, and did not file a motion to obtain the fees necessary for an investigator. The State disagrees, even going so far as to say that many of Petitioner's allegations are waived for failure to cite to the record or provide a sufficient argument in his brief.

With regard to the issues involving communication and investigation of witnesses, the post-conviction court accredited the testimony of both trial counsel. Trial Counsel One stated that he met with Petitioner multiple times prior to trial and was prepared, both for trial and the 404(b) hearing. Trial Counsel Two testified in a similar manner.

With regard to interviewing and investigating other witnesses, the post-conviction court again accredited the testimony of Trial Counsel One and Trial Counsel Two, both of whom testified that Petitioner failed to give the specific contact information for such witnesses or that even when given the contact information they were unable to locate the witnesses. Moreover, Petitioner failed to produce any of the witnesses at the post-conviction hearing. "When a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner a the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Generally, presenting such witnesses is the only way a petitioner can establish that "the failure to discover or interview a witness inured to his prejudice . . . or . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence." *Id.* Accordingly, even a petitioner who establishes that trial counsel deficiently performed by failing to investigate or call witnesses is entitled to no relief "unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Id.* at 757-58. Petitioner failed to call any witnesses at the post-conviction hearing. Therefore, Petitioner is unable to prove that he was prejudiced by the absence of these witnesses at trial. *See id.* at 757. Petitioner cannot meet both prongs set out in *Strickland* and, for this reason, cannot be successful on this issue. *See Strickland*, 466 U.S. at 687. Additionally, the post-conviction court concluded that Petitioner was unable to prove, by clear and convincing evidence, that Trial Counsel One or Trial Counsel Two were ineffective. The evidence does not preponderate against the judgment of the post-conviction court.

Petitioner has failed to show that but for trial counsel's alleged deficiencies, he would have refused to plead guilty and insisted on going to trial. Petitioner testified at the post-conviction hearing that he was rushed into pleading guilty and only pled guilty because of trial counsel's ineffectiveness.

Petitioner has not proven that representation by either Trial Counsel One or Trial Counsel Two was deficient or that he would not have pled guilty without the alleged errors and gone to trial. Petitioner stated himself at the guilty plea hearing that he was satisfied with the representation from both trial counsel. It is up to the trial court to determine credibility of witnesses, and the post-conviction court's findings have the weight of a jury verdict. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). Therefore, Petitioner has not met either prong under *Strickland*.

*Guilty Plea*

Petitioner also argues that the post-conviction court erred in dismissing his petition because he entered his plea unknowingly and involuntarily. The State disagrees.

When analyzing a guilty plea, we look to the federal standard announced in *Boykin v. Alabama*, 395 U.S. 238 (1969), and the State standard set out in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superceded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). In *Boykin*, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242; *see Pettus*, 986 S.W.2d at 542. Similarly, our Tennessee Supreme Court in *Mackey* required an affirmative showing of a voluntary and knowing guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. 553 S.W.2d at 340; *see Pettus*, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and its consequences. *Pettus*, 986 S.W.2d at 542; *Blankenship*, 858 S .W.2d at 904.

Petitioner argues that his guilty plea was entered unknowingly because he received ineffective assistance of counsel. The post-conviction court determined that Petitioner knowingly and voluntarily entered the guilty plea after learning about the consequences of the plea from counsel and reviewing those with the trial court. This Court, therefore, finds

-13-

that the Petitioner failed to establish, by clear and convincing evidence, that the plea was entered unknowingly or involuntarily.

As stated above, the post-conviction court's factual findings are given a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. We have found nothing in the record to preponderate against the post-conviction court's findings. Petitioner has failed to prove that Trial Counsel One and Trial Counsel Two did not discuss the plea with Petitioner prior to its entry.

The transcript of the guilty plea hearing reflects that the trial court discussed the ramifications of the guilty plea with Petitioner. The trial court thoroughly questioned Petitioner to ascertain whether he understood the effects of the plea. The plea hearing also indicates that Petitioner knew what he was doing, understood the plea, and agreed that it was what he wanted to do to resolve the case. Petitioner has failed to show by clear and convincing evidence that he received ineffective assistance of counsel or that his guilty plea was involuntary. Moreover, Petitioner has failed to prove that he did not understand the consequences of his plea.

## CONCLUSION

For the foregoing reasons, we affirm the denial of Petitioner's petition for post-conviction relief.

_____
JERRY L. SMITH, JUDGE